## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Crim. No.  21-726 (CJN)** |
|  | ) |  |
| **v.** | ) |  |
|  | ) |  |
| **JOSIAH KENYON** | ) |  |
|  | ) |  |
|  | ) |  |

## <u>MEMORANDUM IN AID OF SENTENCING</u>

"I have always found that mercy bears richer fruits than strict justice."

Abraham Lincoln

1

"With the passage of Easter, my thoughts dwelt on restoration, renewal, and words
of Scripture regarding repair, 'binding up what has been broken'; and, of course,
hope-redemption and the 'lifting up of the crushed in spirit.'"

Elizabeth Kenyon, April 23, 2022

Crushed in spirit aptly defines Josiah Kenyon's life.  After his parents did not want to raise him any long, he lived on the streets for most of his adolescent and young adult life.  When he started a family with Elizabeth, they struggled to create a physical home to raise their two sons.  Odd jobs sporadically provided some financial support.  They were starting to see the brighter future a few years ago.  In that vision, they could provide more stability for their sons, despite their meager finances.  They would not only work in their unique crafts but they would build a community to help others.   However, the beginning of 2020 rang in new financial worries.  Josiah and Elizabeth "heard rumors of empty store shelves."[1]  And then the COVID-19 pandemic hit.  Finances dwindled along with Josiah's emotional and mental stability.  They "now had no real plan amid the fear and uncertainty of the pandemic, and the sensation of having lost the progress he made caused Josiah deep grief."[2]

By the end of 2020, Josiah, along with hundreds of others, believed that the government was the cause of their woes.  In addition, with the new year of 2021, which would usher in a new administration, Josiah believed that he was

---

[1] Letter by Elizabeth Keyon, March letter (Exhibit 1).
[2] Id.

"witnessing corruption and evil destroying the nation."[3]  Months prior to the 2020 election, Former President Trump made several claims attacking the security of mail-in ballots and about the possibility of a rigged election.[4]  He tweeted a month before the election, that this would be "the most corrupt Election in American history!"[5]  On November 3, 2020, approximately, 74 million people voted for Trump in the 2020 election.  He declared that he won the election.[6]  By this time, 74 million people were acclimated to the idea that if Trump did not win, the election was stolen.

By the time of the election, "Trump's claim[s] [were] **persuasive** to many because the idea was already **part of their DNA**."[7]  Hence, by November 2020, it was "not that difficult to believe Biden did not win legitimately when your mind is made up and not open to persuasion, especially when you are **continually bombarded with conspiracy theories and unsubstantiated claims by**

---

[3] Id.

[4]     Steve Inskeep, *Timeline: What Trump Told Supporters For Months Before They Attacked*, NPR Politics, February 8, 2021, available at https://www.npr.org/2021/02/08/965342252/timeline-what-trump-told-supporters-for-months-before-they-attacked (last viewed on Aug. 4, 2022); see also Alexandra Hutzler, *Trump Started Tweeting About Election Fraud in April 2020, Eight Months Before Capitol Riot*, Newsweek, February 10, 2021, available at https://www.newsweek.com/trump-started-tweeting-about-election-fraud-april-2020-eight-months-before-capitol-riot-1568365.

[5]     John Woolley and Gerhard Peters, *Donald J. Trump Tweets of October 7, 2020,* at 02:14:11, The American Presidency Project, U.S. Santa Barbara, available at https://www.presidency.ucsb.edu/documents/tweets-october-7-2020)

[6]     Inskeep, footnote 2 *supra.*

[7]     Stephen Stathis, *Why do so many still believe the 2020 election was stolen?*, The Hill, April 11, 2022, available at https://thehill.com/opinion/campaign/3263802-why-do-so-many-still-believe-the-2020-election-was-stolen/ (emphasis added).

**Trump, social media, and news sources designed to undermine the validity of the results."**[8]

For Josiah, the corruption he believed he witnessed, along with impact it had on dashing his hopes of stability for his family, propelled him to action – "He felt that he was witnessing corruption and evil destroying the nation and taking hope from our family and millions like us, and [he] could not live with standing by and watching in silence."[9]

Hundreds of people have been sentenced for their actions on January 6th. Some prepared for battle by dressing in military gear in order to "Stop the Steal." Josiah is not one of those people. And, some posted photographs of themselves boasting of their conduct that day. Josiah is not one of those people. Instead, Josiah is and remains remorseful for his conduct. He told officers the day of his arrest, "I should not have done it." Based on the nature and circumstances of the offense, his background, mental health needs, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence 48 months, which would be a sentence not greater than necessary to address his conduct in this case.

---

[8]       Stathis, footnote 8, *supra* (emphasis added).
[9] Id.

## <u>TIMELINE OF JANUARY 6th EVENTS</u>

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[10]  Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[11]  Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

| | |
|---|---|
| **<u>11 a.m.</u>** | High-profile figures of the Republican Party spoke directing the Trump supporters: |

- Representative Mo Brooks (R-Ala.) urged "American patriots" to "**start taking down names and kicking ass**."[12]
- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[13]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican

---

[10]    Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[11]    George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[12]    *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachment-stop-the-steal-speakers-467554 (emphasis added).

[13]    *Id*. (emphasis added).

lawmakers to challenge the election result and **"punch back from Donald Trump."**[14]

- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right."**[15]

- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[16]

- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[17]

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

| | |
|---|---|
| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[18] |
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk |

---

[14]   *Id.* (emphasis added).

[15]   *Id.* (emphasis added).

[16]   *Id.* (emphasis added).

[17]   *Id.* (emphasis added).

[18]   *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

down Pennsylvania Avenue. I love Pennsylvania Avenue. **And we're going to the Capitol**, and we're going to try and give.[19]

It is no surprise that after hearing these speeches, hundreds of people started marching toward the Capitol.  By this time, some Trump supporters started fighting with the police.

**1:10 p.m.**                    Supporters "begin grappling with police on the Capitol steps." [20]



**1:30 p.m.**                    After Trump's speech, "supporters being marching toward the U.S. Capitol."[21]

---

[19]     *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at
https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra,
https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[20]     Petras, *Timeline*, footnote 2 supra.

[21]     Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days*

**2:11 p.m.**                     Photographs indicate that supporters moved past the
police lines on the west side of the Capitol and others
scale the walls.[22]

## LEGAL PRINCIPLES

### Sentencing Law

**1. History – From unfettered discretion to Guideline bound.**

For 200 years, federal judges had wide discretion when it came to sentencing

and could sentence how they saw fit and "there was virtually no appellate review of

the trial judge's exercise of sentencing discretion."[23]  Former federal judge, Marvin

E. Frankel was the "most influential critic[] of indeterminate federal sentencing"

and in 1972, he published a "forceful …. indictment of the sentencing authority he

himself exercised--powers which he described as 'almost wholly unchecked and

sweeping' and which he found 'terrifying and intolerable for a society that

professes devotion to the rule of law.'" [24]  Judge Frankel called for a "Commission

on Sentencing" and the enactment of laws to make guidelines that would be

"binding" on federal judges. [25]  Congress answered Judge Frankel's call and in 1984

the Sentencing Commission was born.  For decades, the U.S. Sentencing

Guidelines were binding.

---

*unraveled inside and outside the Capitol*, The Washington Post,
https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-
visual-timeline/ (last accessed on Feb. 28, 2022).
[22]      Petras, *Timeline*, footnote 2 supra.
[23]      Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative
History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225
(1993).
[24]      *Id.* at 228.
[25]      *Id.*

The era of binding guidelines ended seventeen years ago, when the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively ***advisory.***" *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added).  Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)).  While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider <u>all</u> the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Overall, in light of *Booker*, courts must treat the Guidelines as <u>one</u> among several of the sentencing factors.

18 U.S.C. § 3553(a) provides that the Court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable

9

category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and*

*rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added).  With that limitation and considering all of

the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but*

*not greater than necessary*, to comply with the purposes [of sentencing]."  *Id*. §

3553(a) (emphasis added).

### 2. The Sentencing Guidelines are *only one factor*, thus Courts must not anchor themselves to the Guidelines.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines

are merely one factor to be considered by district courts when fashioning a

reasonable sentence and that the Sentencing Guidelines are not to be weighed more

heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338

(2007); *Gall v. United States*, 552 U.S. 38 (2007).  A sentencing court shall not simply

presume that a sentence within the Guideline range is automatically reasonable or

that a sentence within the Guideline range is more reasonable than a sentence

outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The

sentencing court further shall not presume that a sentence outside of the Guidelines

range is unreasonable.  *Id.*  By considering the Sentencing Guidelines along with all

of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the

defendant's sentence to the thorough adversarial testing contemplated by federal

sentencing procedure." *Rita*, 551 U.S. at 351.

It is critical for sentencing courts to consider all sentencing factors and to not

give undue weight to the Sentencing Guidelines because, as the Supreme Court has

long emphasized that "'[i]t has been uniform and constant in the federal judicial

tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

Overall, judges are encouraged to resist "anchoring" the sentence on the guideline numbers. "Anchoring is a cognitive bias that describes the human tendency to adjust judgments or assessments higher or lower based on previously disclosed external information - the 'anchor.' Studies demonstrate 'that decisionmakers tend to focus their attention on the anchor value and to adjust insufficiently to account for new information.'" Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Sot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 495 (2014) (citations omitted).

> It is important to distinguish the guidelines' intended, salutary effect - promoting consistency and proportionality in sentencing - from the unintended anchoring effect that the guidelines can exert. … Anchoring leads to cognitive error not insofar as judges intentionally use the guidelines in an advisory fashion, but instead when judges irrationally assign too much weight to the guidelines range, just because it offers some initial numbers.

*Id.* at 524 (inner quotation marks and citation omitted); *see also United States v.*

*Docampo*, 573 F.3d 1091, 1105 n.5 (11th Cir. 2009) (Barkett, J., concurring and dissenting) ("Not only have district courts now become used to relying on [the Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis").

## **ARGUMENT**

While the nature and circumstances of the January 6th events were indeed serious, Mr. Kenyon's particular actions that day, paired with his individual history and characteristics lends itself to a sentence of 48 months, which would meet the purposes of sentencing, without being overly punitive.

### I. **Nature and Circumstances of Mr. Kenyon's Offense**

The events of January 6th are seared into the nation's memory. That day and the days after resulted in lost lives and over 1 million dollars in property damage. In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Mr. Kenyon understands and would never minimize the impact of the event on the nation. When he was arrested, he admitted that he was present at the Capitol on January 6th. He admitted that he wore a Jack Skeleton costume, which explained that he purchase from Walmart, and it was the only thing he had clean. He admitted to going into the Capitol building. He admitted to striking an officer with a table leg. And, importantly, he stated that he should not have done it.

He admitted to trying to raise the violence level, but in the end, he was emotional when talking to the police and stated that his ultimate goal was to get

shot, believing that he failed his family and that they would be better off without him.

To provide full context, Mr. Kenyon at times interacted peacefully with officers. As displayed in the screenshots below, Mr. Kenyon stood calmly with others and with an officer who took a picture with another person:







## II.   <u>Mr. Kenyon's History and Characteristics</u>

Josiah Kenyon was born in King County, Washington to his parents, Brian Kenyon and Louanne Kelley.  Josiah's parents were married until they separated, when Josiah was just 12 years old.  During this time, Josiah lived with his mother, without his brother.  He was essentially left alone and without any male role models. Two years later, Josiah's mother married Brian Kelly, when Josiah was 14 years old.

Unfortunately, this would not become the family that Josiah had always wanted. He did not get along with his stepfather and quickly lived away from home. At first, Josiah had entered a juvenile facility.  Upon his release, Josiah felt better trying to live on the streets than go back home.

Josiah was homeless at the age of 14.  Josiah has been someone who has lacked stability for most of his adolescent and young adult life, staying in places for only a couple months at a time traveling state to state in search of a safe home. Josiah is not the only one in his family who has suffered from homelessness. His brother has struggled with homelessness as well and lives in a tent in Los Angeles. Josiah does not have any contact with his brother at this time.

Even as Josiah became older, this problem of homelessness did not go away. Josiah married Elizabeth Kenyon in the spring of 2009. While Josiah started a family with Elizabeth, they had still struggled to create a physical home. Josiah and Elizabeth had two sons, 12-year-old J.K. and 9-year-old K.K.. Josiah stated that

during the time of his arrest and even now that his wife and children remain

homeless, living in a camper van migrating from area to area, PSR ¶ 81.

 While struggling with homelessness, Josiah also has a documented history of

debilitating mental illness and trauma. Notably, "[r]ates of mental illness among

people who are homeless in the United States are twice the rate found for the

general population."[26]  The reason for Josiah leaving home at such a young age was

due to the abuse he suffered from his mother and his stepfather.

 Being alone and unprotected led Josiah to him being an easy target for

violence. "Without a door to lock, people without housing are vulnerable. Dramatic

cases drive headlines, but violence directed at homeless people is constant,

mundane, and devastating."[27]   In addition,

> past studies have shown the homeless are more likely to be victims of
> violent crime than housed people. Tracking crimes against individuals
> experiencing homelessness has always presented a deeper challenge.
> Unlike sex or race, housing status is not often a factor logged by
> authorities when recording a crime victim's details.[28]

Mr. Kenyon had been a victim countless times, as seen from the scars and reported

injuries that he's sustained.  Josiah has been shot, not once, but on three separate

---

[26] American Psychological Association, *Health and Homelessness*, 2011, available at
https://www.apa.org/pi/ses/resources/publications/homelessness-health (citing
Bassuk et al., 1998).
[27] Margot Kushel, MD, *Violence Against People Who Are Homeless: The Hidden
Epidemic*, Univ. of California San Franscsio, Benioff Homelessness and Housing
Initiative, July 14, 2022, available at https://homelessness.ucsf.edu/blog/violence-
against-people-homeless-hidden-epidemic
[28] Kyle Swenson, *Serial murders, beatings and beheadings: Violence against the
homeless is increasing, advocates say*, January 24, 2022, available at
https://www.washingtonpost.com/dc-md-va/2022/01/24/serial-murders-beatings-
beheadings-violence-against-homeless-is-increasing-advocates-say/

occasions, PSR ¶ 85. On each occasion, he was attacked by gang members and a victim of street violence. Josiah also states that he has been stabbed on several occasions. Josiah, being homeless and alone, did not seek out medical treatment and self-treated his wounds. Josiah had to learn how to be a survivor.

Josiah has struggled with his mental health throughout his time being homeless. Josiah has been diagnosed ███████████████████████████ ████████████████████████████ while receiving treatment from multiple facilities in California, PSR ¶ 88.  One of the facilities that he received treatment in was Pine Grove in San Fernando Valley, California. This psychiatric hospital was shut down in 2002 due to incidents of sexual misconduct and patient violations . The violations were so egregious the hospital was no longer allowed to house any involuntarily admitted mentally ill patients from a mandate ordered by Los Angeles County1. This is where Josiah tried to receive help during his younger years, in a place that not only neglected their patients but abused them. Josiah has never truly felt safe.

Despite their environmental and housing struggles, Josiah still continues to receive love and support from his wife. Josiah's wife, Elizabeth, describes him as a loving husband, a doting father, and a devout Christian who has dedicated his life in service of God. She writes:

> Josiah was raised with fervent belief in serving God and
> country…Although his youth was disrupted by the divorce of his
> parents and exposure to homelessness and criminal culture, he always
> kept his moral compass…He has witnessed and ministered to many,
> even in the midst of his own hopelessness. He expressed to me that he

viewed himself as expendable - that he would gladly give his life to help another person have a better chance.[29]

Josiah has more recently struggled with thoughts of suicide and feelings of worthlessness that were amplified during the Covid-19 pandemic. With even more uncertainty and lack of stability for himself and his family, Josiah entered into a dark place. Elizabeth writes about Josiah's struggles, attempting to convey the amount of pain that he was going through:

> During the following months, Josiah's mental and emotional stability were affected poorly by our circumstances. We now had no real plan amid the fear and uncertainty of the pandemic, and the sensation of having lost the progress we had made caused Josiah deep grief... He began telling me with increasing frequency that he thought he was losing his mind.[30]

Josiah believed that the government was "plotting to kill us all." His wife notes, "This is an excellent example of the mistrust and fear blighting the psyche of our populace."[31]

Josiah is currently on medications for his mental health.. Josiah plans on taking his mental health seriously by continuing any proper treatment and medications upon his release. Josiah has completed a number of odd jobs and skills while working in tools, bail recovery and as a handyman. Josiah had recently been collecting Social Security income supplements until it was discontinued around the time of his arrest. Josiah is ready to finally create that stability in his mental and physical world as a husband, a father and as a productive member or society.

---

[29] Letter by Elizabeth Kenyon, Exhibit 1.
[30] Id.
[31] Letter by Elizabeth Kenyon, April 23, 2022 (Exhibit 3).

### III.   The Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Incarceration is not required in order for a sentence to reflect the seriousness of the offense.  "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Mr. Kenyon, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual.  Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities.  Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 271 inmates have died from COVID-19.[32]  With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates.

Mr. Kenyon has been detained at the Northern Neck Regional Jail, where he

---

[32] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed December 8, 2021).

complained and did not receive the mental health or physical treatment he sought. Hence, the time he has already served under that condition, should count as if he served more time.

IV. **The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Kenyon.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The national attention of this case has been a deterrent for Mr. Kenyon. Any time, someone searches his name on social media, several articles on January 6th appear.

There is nothing to indicate that a lengthy sentence will achieve deterrence. Even the Sentencing Commission determined that "[t]here is no correlation between recidivism and guidelines' offense level."[33] Specifically, "[w]hether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected. **The guidelines' offense level is not intended nor designed to predict recidivism**." [34]

The public will be protected while Mr. Kenyon is being supervised by the Probation Officer, which will further deter any criminal conduct. The Court may also impose additional conditions of supervised release in order to ensure the safety

---

[33] See U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines*, at 15 (2004).
[34] *Id.* (emphasis added).

of the community.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect."[35]  With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."[36]  Notably, "the great majority of studies point to a null or criminogenic effect of the prison experience on subsequent offending."[37]  Hence, "'[t]his reading of the evidence should, at least, caution against wild claims--at times found in "get tough" rhetoric voiced in recent decades--that prisons have special powers to scare offenders straight."[38]  A lengthy sentence is not needed to deter criminal conduct in this case.

### V.   The Pertinent Policy Statement Favors a Non-Custodial Sentence.

Congress requires the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence **other than imprisonment in cases in which the defendant is a first offender**...." 28 U.S.C. § 994(j)(emphasis added).  Mr. Kenyon has no countable criminal history points.  See

---

[35] *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).
[36] Id.
[37] Daniel S. Nagin, Francis T. Cullen, Cheryl Lero Jonson, *Imprisonment and Reoffending*, 38 Crime & Just. 115, 178 (2009)
[38] Nagin, et al., *supra* note 35.

Final Presentence Report, ¶ 10.  The Sentencing Commission has noted that offenders who fall into Criminal History Category I are less likely to receive a straight prison sentence. [39]

## VI.   <u>The Requested Sentence Would Not Create An Unwarranted Sentencing Disparity</u>

Sentencing Mr. Kenyon to 48 months would not contribute to an unwarranted sentencing disparity.  In the case of *United States v. Thompson*, 21-cr-461-RCL, the defendant struck an officer with a baton and received a 46-month sentence.  In *United States v. Languerand*, 21-cr-353-JDB, the defendant threw several objects at officers, grabbed a police shield, and later excitedly described his actions on social media.  He received a 44-month sentence.  In *United States v. Howard*, 21-cr-721, the defendant struck an officer with a metal poll.  He received a 46-moth sentence.

## VII.   <u>Request for Variance.</u>

Mr. Kenyon requests this Court vary down the guidelines for several reasons.  First, Mr. Kenyon's mental and emotional condition warrant a variance.  The Sentencing Commission has recognized that mental and emotional condition may be relevant in granting a departure.  U.S.S.G. § 5H1.3.  Hence, it is relevant for a

---

[39] *See* U.S. Sentencing Comm'n, *Recidivism and the "First Offender,"* (May 2004) p. 10, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (last accessed on April 29, 2021).

23

variance.  Mr. Kenyon has had a long history of mental health needs, which have not been adequately treated. See PSR ¶ 88.[40]

Second, Mr. Kenyon is a low risk of recidivism and a lengthy sentence would increase the likelihood of recidivism.  "[W]hen prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contracts in the community, and become removed from legitimate opportunities, all of which promote recidivism."[41]  Alternatively, a shorter sentence would provide Mr. Kenyon with the opportunity to maintain his relationship with his wife, and particularly his young sons.  Even in a case where a defendant had previously served time, a significant variance can be reasonable when the defendant "ha[d] never been in custody for any substantial period of time."[42]

## Conclusion

Considering the § 3553(a) sentencing factors, a sentence of 48 months, a term of supervised release, and restitution, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

> Respectfully submitted,
>
> A.J. KRAMER
> FEDERAL PUBLIC DEFENDER
>
> _____/s/_____
> Ubong E. Akpan
> Assistant Federal Public Defender

---

[40] The defense plans to supplement this memorandum with the psychological report, which is forthcoming.
[41] Valerie Wright, *Deterrence in Criminal Justice*, The Sentencing Project, at 7 (Nov. 2010).
[42] *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006) (varying 68 months below the low-end of the guideline range).

625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500